UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARY KELLY, <br><br> *Plaintiff*, <br><br> v. <br><br> COVENANT HOMES, INC. d/b/a <br> COVENANT VILLAGE OF CROMWELL, <br><br> *Defendant*. | Civil No. 3:16-cv-920 (JBA) <br><br> July 18, 2018 |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Mary Kelly ("Kelly" or "Plaintiff") brings this claim for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and discriminatory termination in violation of the Age Discrimination in Employment Act ("ADEA") against her employer Covenant Home, Inc.,[1] having abandoned her claims of sexual harassment and gender discrimination under Title VII and the Connecticut Fair Employment Practices Act. Kelly alleges that she was terminated on the basis of age and in retaliation for her having complained of sexual harassment. Defendant Covenant Homes, Inc. contends that it terminated Kelly after she failed to verify and accurately enter a potential customer's financial information in an application, and moves for summary judgment on both remaining claims. For the reasons set forth below, the Court DENIES

---

[1] Defendant represents that "Covenant Home, Inc. is a Connecticut nonstock corporation that operates Covenant Village of Cromwell[,]" and "Covenant Retirement Communities ('CRC') is the sole corporate member of Covenant Home, Inc." (Mem. Law Supp. Def.'s Mot. Summ. J. [Doc. # 46-1] at 1.)

Defendant's motion on Plaintiff's remaining Title VII retaliation claim and ADEA discriminatory termination claim.

I. **Background**

Covenant Village initially hired Plaintiff in May 2013 to work as a Sales Representative. (Def.'s L.R. Stmt. [Doc. # 46-6] ¶ 1; Pl.'s L.R. Stmt. [Doc. # 47-1] ¶1 (collectively referred to as "Parties' L.R. Stmts.").) Covenant Village of Cromwell describes itself as a Covenant Retirement Community, which is a "faith-based senior living community." (Ex. B [Doc. # 46-2] to Def.'s Mot. Summ. J. at 50, 53.) In mid-2013, Chuck Kane, a sales consultant employed by the firm of Martino & Binzer, allegedly told Plaintiff she was attractive, complimented her eyes, and asked if she would be able to work with him "now that [he had] endeared [himself] to [her]." (Parties' L.R. Stmts. ¶ 3.) Although employed by another firm, Plaintiff testified that Kane was managing her and other sales representatives in his capacity as consultant to Covenant Village. (Ex. 3 (Pl.'s Dep.) [Doc. # 47-4] to Pl.'s Opp'n to Def.'s Mot. Summ. J. at 116.) Plaintiff did not tell anyone at Covenant Village about the incident at that time. (Parties' L.R. Stmts. ¶ 3.)

In a second incident, which the parties now agree occurred on a day in August 2013, after 5 p.m., Kane put Plaintiff in "a strong embrace[,]" "put his hand on [her] buttocks," ran his hand "up [her] back and then started going into [her] hair and breathing heavily." (Pl.'s Dep. [Doc. # 47-4] at 110.) Plaintiff pushed him way and said "Get away. Just don't touch me." (*Id.*) From then on, Plaintiff made sure never to be in a room alone with Kane and locked her office door to prevent him from coming in. (*Id.* at 111.)

The next day, Plaintiff told Lisa Roy, an administrative assistant, about the incident. (Parties' L.R. Stmts. ¶ 4.) Neither Plaintiff nor Ms. Roy reported Mr. Kane's behavior to management or to Human Resources at that time. (*Id.*)

2

Finally, on June 19, 2014, Plaintiff was in her office around 3:30 or 4:00 p.m., talking on the phone with a sales prospect, when Kane "c[ame] barreling in[,]" ignoring Plaintiff's requests that he leave because she was on the phone. (Pl.'s Dep. [Doc. # 47-4] at 119.) Kane maneuvered around the length of Plaintiff's L-shaped desk and kissed her on the neck. (*Id.* at 120.) Kane had closed the door behind him. (*Id.*) Plaintiff reacted by swinging her left arm at him, but the hit did not land "because he ran." (*Id.* at 121.) Plaintiff immediately reported the incident to Margaretann Foster, Sales Director. (Parties' L.R. Stmts. ¶ 5.)

Foster testified that because at the time Defendant did not have a human resources director, Foster escalated the matter to Defendant's Executive Director, Pamela Klapproth. (Ex. C (Foster Dep.) [Doc. # 46-3] to Def.'s Mot. Summ. J. at 115-16.) Klapproth and Foster called Rob Young, the Vice President of Sales, to inform him and also spoke with Dave Martino, whose consulting firm employed Kane. (*Id.* at 116-17.)

The next day, June 20, 2014, Deb Tate, Vice President of Human Resources for Covenant Retirement Communities, undertook an investigation of plaintiff's complaint about Mr. Kane. (Parties' L.R. Stmts. ¶ 6.) The investigation included interviews of Plaintiff, Ms. Foster, and several other witnesses, as well as communications with Mr. Kane's employer. (*Id.*)

After the investigation was completed, Defendant changed Kane's role so that he would no longer be coming to the campus at which Plaintiff worked, and would no longer be responsible for coaching Plaintiff or other sales representations. (Ex. E (Klapproth Dep.) [Doc. # 46-4] to Def.'s Mot. Summ. J. at 35-37.) Defendant and Kane's employer subsequently decided, however, not to remove Kane from his role as a consultant for Defendant. (*Id.* at 37-39.) Klapproth explained to Plaintiff that "Kane was still going to have involvement with the Connecticut campus; however, his role had changed where he remotely would be tracking sales metrics data, that he would not be

3

visiting the campus, and most of his interaction would be with [Foster] and [Klapproth]." (*Id.* at 67.)

According to Plaintiff, Foster told Plaintiff that Kane was continuing to listen to Plaintiff's recorded calls with sales prospects and providing feedback to Foster. (Ex. A (Pl.'s Dep.) [Doc. # 46-2] to Def.'s Mot. Summ. J. at 130-31, 142-44.) Plaintiff says she later learned from Foster that Kane was providing "false and negative" feedback about Plaintiff's performance on these calls. (Kelly Aff. ¶ 27.) Plaintiff says she "went to Gail Fancher, the [Covenant Village of Cromwell] Human Resources director, to complain that Mr. Kane was still monitoring my calls and providing feedback on my job performance; Ms. Fancher told me she would look into it, but never got back to me about it." (*Id.* ¶ 28.)

While Plaintiff never saw Kane at the Covenant Village campus again, she cites Kane's July 2014 expense report as evidence that he did in fact come back to the Connecticut campus, despite the assurances she had received. (Ex. 25 to Pl.'s Opp'n.)

During the summer of 2014, Plaintiff began working with a prospect named Fran. (Parties' L.R. Stmts. ¶ 9.) Over a period of several months, Plaintiff spoke to or met with Fran on multiple occasions. (*Id.*) On January 12, 2015, Fran's financial application was submitted to FinAid, listing a house in Lebanon valued at $300,000. (Parties' L.R. Stmts. ¶ 10.) With respect to real estate holdings, the applicant is instructed on the application to provide her "share of the market value minus expected selling costs." (*Id.*) The Routing Sheets accompanying the application list Plaintiff as the Campus Sales Representative under the statement, "I have reviewed the financial application provided by the applicant(s) and it is complete." (*Id.*)

Plaintiff testified, however, that she did not have any responsibility for ensuring that the information the applicant provided was accurate, because as part of the application process, the

4

applicant was required to provide proof substantiating the financial information, which Plaintiff would not collect. (Pl.'s Dep. [Doc. # 47-4] at 84-85.) According to Plaintiff, this role fell to the sales director, who in 2014 became Margaretann Foster. (*Id.*)

While the parties dispute whose job it was to ensure that the form was filled out correctly, they agree that the form did not make clear that Fran owned only a share of the $300,000 value of the house listed on her application. (Parties' L.R. Stmts. ¶ 11.)

Defendant contends that during Fran's visit to Covenant Village on January 22, 2015, Ms. Foster came to realize that, contrary to the way it was portrayed on the application form, Fran's ownership interest in the house was only $100,000. (Def.'s L.R. Stmt. ¶ 13.) Plaintiff denies this statement to the extent that Defendant suggests Foster was unaware of Fran's partial ownership of the house prior to January 22, 2015. (Pl.'s L.R. Stmt. ¶ 13.) Plaintiff argues that Foster knew of Fran's partial home ownership of the house as early as December 19, 2014, citing a note in the "Answers on Demand" ("AOD") system that Plaintiff had entered regarding Fran's concern that she could not afford Covenant Village, which Plaintiff believes Foster would have seen when Foster put her own notes into the system regarding Fran. (*Id.*) Foster testified that she did not review Plaintiff's AOD entries about Fran, despite knowing that Fran had concerns about affording the community. (Ex. 6 (Foster Dep.) to Pl.'s Opp'n at 233-34.)

The parties agree that Foster went to Klapproth to inform Klapproth about problems with Fran's financial qualifications, but dispute whether Foster had just become aware of the issue or had known all along. (Parties' L.R. Stmts. ¶ 14.) Neither party directs the Court to record evidence that definitively establishes when Foster became aware of the actual value of Fran's share of the house, but Plaintiff argues that Foster was on notice of the issue given her awareness of Fran's

financial concerns and the fact that Foster was making entries about Fran in the same AOD system where Plaintiff was recording information about the house. (*Id.*)

The following Monday morning, January 26, 2015, after Fran's visit, Foster advised Plaintiff that she was being placed on suspension pending further investigation. (Parties' L.R. Stmts. ¶ 15.)

Klapproth ultimately determined that Plaintiff had used poor judgment both in neglecting to question Fran's valuation of her ownership interest in the Lebanon property and in failing to come forward with any of the troubling information she learned about Fran's finances, including not only the fact that Fran did not own 100% of the house valued on the application form as a $300,000 asset but also Fran's doubts about her ability to afford a residence at Covenant Village. (Parties' L.R. Stmts. ¶ 16.)

The parties also dispute the results of a FinAid report with the corrected $100,000 figure for Fran's share of the value of the house. Defendant contends that the report that was processed subsequently using the correct figure projected an expected subsidy (that Defendant expected, actuarially, to incur) of $369,686, which would not have been approved by Defendant's VP of Operations. (Def.'s L.R. Stmt. ¶ 17.) Plaintiff, however, argues that contemporaneous notes of a conversation between Fancher and Klapproth show that the expected subsidy was actually $185,000. (Pl.'s L.R. Stmt. ¶ 17.) At oral argument, Plaintiff argued that the issue of whether Fran could have afforded to live at Covenant Village is an issue of fact for the jury to determine.

On Wednesday afternoon, January 28, 2015, Fancher and Foster called Plaintiff at home and informed her that due to her mishandling of Fran's application, Klapproth had made the decision to terminate her employment. (Parties' L.R. Stmts. ¶ 18.)

II. Discussion

*Legal Standard*

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

1. *Title VII Retaliation*

**Plaintiff's Prima Facie Case**

Under the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." 570 U.S. 338, 360 (2013). In other words, "a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 362. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91

7

(2d Cir. 2015) (citing *Nassar*). However, the but-for causation standard "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

"In order to establish a prima facie case of retaliation, [Plaintiff] must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).

Defendant does not contest that Plaintiff engaged in a protected activity of which Defendant was aware and that Defendant took an adverse employment action against Plaintiff by terminating her. Defendant contends that Plaintiff cannot establish a prima facie case because the record lacks evidence supporting the fourth prong of causation. Defendant also argues that while Plaintiff's termination was an adverse employment action, Defendant's November 2014 written warning did not constitute an adverse employment action.

Defendant argues that the seven month gap between Plaintiff's June 2014 sexual harassment complaint and her termination in January 2015 is too great to support an inference of a causal connection for the purpose of establishing her prima facie case. (*See* Def.'s Mem. Law. Supp. Mot. Summ. J. at 23.) Defendant contends that Plaintiff has no evidence of causation beyond this attenuated temporal proximity, arguing that Plaintiff's own testimony shows that everyone involved took her concerns seriously and believed her complaint. (*Id.* at 23-24.) Defendant argues that it responded to Plaintiff's complaint "in a substantive and aggressive way by immediately

launching an investigation and implementing effective remedial measures that safeguarded [P]laintiff from any further dealings or interactions with Mr. Kane of any kind." (*Id.* at 24.)

If the written warning is also an adverse employment action, however, then the temporal gap shortens from seven months to five months, and Plaintiff was subjected to two, escalating adverse actions within seven months of making her complaint, rather than just one seven months later.

The standard for determining whether an employment action is actionable for the purposes of a Title VII retaliation claim is governed by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). In that case, the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citation omitted).

Plaintiff urges that the November 2014 written warning meets this standard in context, noting that Plaintiff was issued a written warning, which is considered a disciplinary action in Defendant's employee handbook. (Opp'n at 14-16.) Notably, the written warning notes that "[f]ailure to make immediate, dramatic and sustained improvement and correction will result in further disciplinary action up to and including termination." (Ex. 27 to Opp'n [Doc. # 47-28] at 3.) Given that Plaintiff was being warned that she was at imminent risk of termination unless she showed an "immediate, dramatic and sustained improvement[,]" under the flexible standard of *Burlington Northern*, this warning could reasonably be found to constitute the type of action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." At oral argument, Defendant contended that this language was mere boilerplate that standing alone could not constitute an adverse employment action. However, Defendant cites

no record evidence that could establish that Plaintiff or a reasonable worker would have understood this warning as merely standard boilerplate that did not mean what it says. Accordingly, the written warning may be found to constitute an adverse employment action.[2]

In addition to temporal proximity between protected activity and the adverse employment actions, Plaintiff also contends that despite Defendant's initial decision to bar Mr. Kane from the campus where Plaintiff worked, Defendant subsequently had him travel to the campus on at least two occasions, and also allowed Kane to continue to listen to Plaintiff's calls and provide feedback to Plaintiff's supervisors on Plaintiff's performance.

In support of her argument that Defendant reneged on its agreement and permitted Mr. Kane to travel to Plaintiff's place of work on at least two occasions, Plaintiff cites an expense report submitted by Kane. The expense report, however, establishes only that Kane was in the state of Connecticut, not that he came to Plaintiff's place of work, which Plaintiff conceded at oral argument, so this evidence does not support Plaintiff's view that Kane continued to work in proximity to her.

Plaintiff also provides evidence that she came to believe that Mr. Kane continued to monitor her phone calls and provide negative feedback regarding her performance, and that she complained of this to Ms. Fancher. (Pl. Aff. ¶¶ 27-28.) Plaintiff based this belief on Foster's informing her that Kane was the source of negative feedback Foster received about Plaintiff's phone calls. (*Id.* ¶ 27; Pl. Dep. at 164.) Foster denies saying this. (Foster Dep. at 147.)

---

[2] Defendant dedicates a single sentence in a footnote to arguing that Plaintiff's prima facie case fails with respect to her written warning given the five month temporal gap. But Defendant does not address the fact that this warning appears to have taken place after Plaintiff made a second complaint regarding Mr. Kane listening to her calls, which Plaintiff made at some point after June 2014.

Plaintiff attests that when she complained about this to Fancher, Fancher told Plaintiff that she would look into it but "never got back to [Plaintiff] about it." (Pl. Aff. ¶ 28.) Fancher testified that after Plaintiff expressed concern to her that Kane was monitoring her calls, Fancher relayed the concern to Foster, and Foster "researched that on her end and communicated her findings back to" Plaintiff. (Ex. C (Fancher Dep.) to Def.'s Mot. Summ. J. at 92-93.) Specifically, according to Fancher, Foster verified that Mr. Kane was not in fact monitoring Plaintiff's calls. (*Id.* at 93.) Foster also testified that she investigated Plaintiff's concern and confirmed that Mr. Kane was no longer monitoring Plaintiff's calls. (Foster Dep. at 146-148.)

In sum, Plaintiff's evidence of retaliation is as follows:

- she complained of sexual harassment in June 2014

- at some time after June 2014 she learned the alleged harasser continued to monitor her calls and provide negative feedback on her performance and complained of the same

- Defendant failed to address her concerns about the harasser continuing to provide feedback on Plaintiff

- at some time after Plaintiff raised these additional concerns, and shortly after receiving a positive annual performance review, Defendant issued Plaintiff a written warning stating that she was at imminent risk of termination unless she showed an "immediate, dramatic and sustained improvement" in November 2014

- two months later, in January 2015, Plaintiff was terminated

Taken together, this evidence is sufficient to establish causation for the purpose of Plaintiff's prima facie case. While there is a seven month gap between the June 2014 complaint and the January 2015 termination, Plaintiff's intervening complaint and Defendant's written warning

during this seven month period are points on a straight line between Plaintiff's engaging in protected activity and her termination.

**Pretext**

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (citations omitted).

Defendant contends that even if Plaintiff satisfies her prima facie burden, it is entitled to summary judgment on this claim due to the lack of record evidence casting doubt on Defendant's proffered non-retaliatory reason for termination: Plaintiff's "failure to disclose information she possessed about Fran's financial condition that rendered her vastly unqualified to afford housing at Covenant Village . . . ." (Mem. Law Supp. Mot. Summ. J. at 28.)

However, the record does reflect that Plaintiff disclosed the information that she possessed about Fran's financial condition by making entries to this effect in the AOD system, although Plaintiff's supervisor, Ms. Foster, denied having seen these entries or having any responsibility to check these entries when she was making her own entries about Fran in the AOD system. The record provides fertile grounds for dispute over whether Defendant legitimately believed that Plaintiff was attempting to intentionally hide information by omitting it from Fran's application given the entries that Plaintiff did in fact make and that were visible to Foster, whether or not Foster chose to review them. While Defendant contends that Plaintiff "knew and withheld" information about Fran's financial unfitness, reasonable jurors could disbelieve that Plaintiff would have made AOD entries about potential financial issues with Fran, but then knowingly

include false information in Fran's application in order to make a sale, in light of the record she had already created of potential issues with the application.

The record also reflects a genuine dispute of material fact as to whether Defendant may have legitimately believed that Plaintiff *negligently* omitted this information, particularly given the disputed evidence on whose job it was to independently verify the financial information on the application before submission—Plaintiff's job or someone else's job.[3] This factual dispute is material because if it was *not* Plaintiff's job to check this financial information, then her having been terminated for allegedly failing to perform a task that she had not been assigned could be found false and thus pretextual. Defendant has not shown itself entitled to judgment as a matter of law and Plaintiff's claim should be left for a fact-finder to determine how to weigh the documentary and testimonial evidence on this point.[4]

---

[3] Defendant's position description for the Sales Representative role held by Plaintiff includes, *inter alia*, the following responsibility: "Ensures processing of all residency applications and forms required for completion of applicant files. Assures resident financial information is complete and accurate prior to Finaid Input." ([Doc. # 46-2] at 51.) Plaintiff does not dispute that she had *some* responsibility for ensuring that the application contained accurate information, but states in her affidavit that it was not her responsibility to independently research the value of a prospective resident's property or the percentage of such a property, (Pl. Aff. ¶ 35), where the applicant is instructed, with respect to real estate holdings, to provide her "share of the market value minus expected selling costs[,]" (Parties' L.R. Stmts. ¶ 10). Here, Fran listed this amount, incorrectly, as $300,000, (Parties' L.R. Stmts. ¶ 10), and in order to submit the application, Plaintiff presents evidence that she was not required to certify that she had independently verified the value of the listed assets but only that she had "reviewed the financial application provided by the applicant(s) and it is complete[,]" (*id.*). Accordingly, a reasonable fact-finder could find that it was not Plaintiff's responsibility to independently verify the value of the listed assets on the application.

[4] Plaintiff also argues that pretext can be inferred in part because Foster was not disciplined for anything related to Fran's application, despite Foster knowing as of December 19, 2014 that Fran had expressed concern about affording Covenant Village (as memorialized in an AOD entry made on that date by Foster). Defendant responds that this statement by Fran was too vague to put Foster on notice that specific information in the application was incorrect. Plaintiff also argues that

13

In summary, because a reasonable jury could find that Plaintiff's engaging in protected activity was the but-for cause of Defendant's decision to terminate her employment, the Court DENIES Defendant's Motion for Summary Judgment with respect to Plaintiff's claim for retaliation in violation of Title VII.

2. *ADEA*

Plaintiff also claims that she was terminated in violation of the ADEA as a result of her age, as part of a pattern of Defendant replacing older employees with younger ones. As the Supreme Court held in *Gross v. FBL Financial Services, Inc.*, an ADEA "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." 557 U.S. 167, 177–78 (2009) (citation omitted).

"In order to establish a prima facie case of age discrimination, [a plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107

---

the record reflects other occasions on which Foster submitted incorrect applications to FinAid that actually resulted in offers for the applicants to move to Covenant Village—unlike here, where the problem was caught before an offer was made—without Foster being disciplined. Defendant responds that Foster is not a proper comparator because she was a supervisor and there is no record evidence that Foster's job duties included checking application accuracy.

Plaintiff replies that since both were "employees within the sales department, held to the same CVOC standards, as dictated by CRC, they are similarly situated." (Opp'n at 22 n.4.) In support of this factual assertion, Plaintiff erroneously cited her deposition testimony. At oral argument, Plaintiff clarified that she intended to cite Defendant's employee handbook as support but did not direct the Court to what part of the 60-page document supported Plaintiff's assertion, and the Court's review of the handbook did not reveal any content clearly demonstrating that Plaintiff and Foster were similarly situated comparators.

(2d Cir. 2010) (citation omitted). Here, Defendant does not dispute Plaintiff's ADEA prima facie case but argues (1) that it terminated Plaintiff for the non-discriminatory reason also proffered in the context of Plaintiff's Title VII retaliation claim and (2) that Plaintiff cannot show that this reason was pretextual.

Notably, while Plaintiff's Title VII retaliation claim is based on both her termination and the written warning she received in November 2014, Plaintiff's claim under the ADEA encompasses only her termination. In any event, the standard Plaintiff must meet for both claims is "but-for" causation, under *Nassar* (Title VII retaliation) and *Gross* (ADEA discrimination).

In addition to the evidence of pretext discussed in the context of Plaintiff's retaliation claim, Plaintiff offers the following additional evidence of pretext:

- During the time that Plaintiff worked for Defendant, all of the older sales staff were terminated and replaced with younger employees:
  - Maureen Brubaker, 62-year-old Sales Director was terminated in summer 2013 and replaced by Foster, then 31.
  - Joseph Menhart, 52-year-old Sales Representative was terminated in June 2014 and replaced by 31-year-old Kim Fiore.
  - Plaintiff was replaced by 24-year-old Katelyn McNulty.
- Foster's age-based disparate treatment. Foster was 32 at the time; Plaintiff was 60.
- Plaintiff was the highest-selling sales representative and had recently been given a positive performance evaluation.

- Foster commented to Kelly that she "looked good for [her] age." (Ex. 3 (Kelly Dep.) to Opp'n at 273.)[5]
- After being terminated, Plaintiff sometimes talked with Ms. Fiore (who replaced Mr. Menhart), who told her that Foster terminated her because Foster wanted a younger sales force.[6]

Defendant again argues that Foster is not a proper comparator, and that Plaintiff lacks evidence beyond her own testimony that it was not her job but Foster's to verify the application information.

For the reasons described above, while the Court concludes that Foster is not a proper comparator to Plaintiff for the purpose of establishing evidence of disparate treatment, Plaintiff presents strong evidence that she was one member of a three- or four-person[7] sales team (including

---

[5] While Defendant asserts that Foster's "compliment" does not evidence age-based animus, a reasonable jury could infer from this statement that Plaintiff's age was on Foster's mind, especially given Plaintiff's testimony that Foster "would say" this to her, suggesting that this was a recurring, rather than isolated comment. Moreover, if Foster subjectively intended this statement as a compliment, a reasonable jury could certainly conclude that telling an ADEA-protected employee that they "look good for their age" evinces age-related bias, insofar as this backhanded compliment effectively suggested to an ADEA-protected employee that most older employees do not "look good."

[6] Significantly, the record does not contain deposition testimony or an affidavit from Fiore substantiating the existence or bases of these comments, but nonetheless Plaintiff proffers Fiore's alleged statement for the truth of what it states. However, "[h]earsay is not admissible unless" provided for by "federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. At oral argument, Plaintiff conceded that at trial, on the present record, there would be no basis for admitting Plaintiff's testimony about Fiore's statement to her, and at this stage the Court will not consider this statement for the purpose of deciding this Motion for Summary Judgment.

[7] The record does not make clear the exact size of the sales team, but Defendant conceded at oral argument that the team's size was either three people or slightly more than three people.

her manager), in which *three* ADEA-protected employees were replaced by younger employees in a period of less than two years. Defendant responds that this evidence is meaningless because it is too small a sample size for statistical significance and because the record lacks any evidence of the age demographics of the applicant pools. In light of Defendant's concession that the entire sales team was not much larger than three people, and in the context of a discriminatory termination claim, as opposed to a discriminatory failure to hire claim,[8] Defendant's arguments do not show entitlement to judgment as a matter of law.

Given the employment termination and replacement record for most members of Plaintiff's team, and the disputed facts related to Defendant's proffered non-discriminatory reason for terminating Plaintiff's employment, a reasonable jury could conclude that Plaintiff's employment would not have been terminated but for her age, and summary judgment will be denied on this claim as well.

### III. Conclusion

For the reasons set forth above, the Court DENIES Defendant's Motion for Summary Judgment with respect to both of Plaintiff's claims.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 18th day of July 2018.

---

[8] The Court of Appeals recently upheld the dismissal of a plaintiff's failure to hire claim where the plaintiff "fail[ed] to plead facts that allow us to infer that the applicants ultimately hired were disproportionately younger than 40, relative to the applicant pool." *Neary v. Gruenberg*, No. 17-2470-CV, 2018 WL 1612234, at *3 (2d Cir. Apr. 4, 2018), *as amended* (Apr. 5, 2018).